Mr. Justice ThacheR
delivered the following opinion :
An indictment for rape was preferred by the grand jury of Warren county against Isaac Turney, at the April term, 1845, of the circuit court of that county. Under the statute á change of venue was allowed, and the indictment was tried in the county of Claiborne, whereupon a verdict of guilty was rendered, and the defendant sentenced to imprisonment in the penitentiary for the term of twenty years.
*111 The defendant below brings the cause into this court by a writ of error, sued out upon exceptions reserved to the ruling of the court, in admitting and rejecting testimony upon the trial.
The first exceptions exhibited in the record relate to the mode of examination pursued with the witness for the State, Mary Folkes. This witness, having previously testified that about the first day of September, 1844, at which time she was just sixteen years of age, the defendant committed a rape upon her, was then permitted to be asked by the State upon her examination in chief this question: — “If Mr. Tttrney then, or at any subsequent time, said anything to you in relation to this matter to dissuade you from disclosing it? — state when, where, and what he said.” Again, the witness, having testified that she was the defendant’s step-daughter, and had lived with him as her guardian from the age of eight or nine years to the year 1842, during which time he had treated her very affectionately, was also permitted to be asked by the State: — “ If in any of his antecedent conversations, he (Turney) offered property, or any other advancement to you in order to attach you to him, say so.” Again, the following question was permitted to be put to the same witness: — “ If at any time subsequent to the transaction, he (Turney) said anything about what punishment the laws of Mississippi would inflict on him, or you, or both — state it all.” These questions were answered affirmatively.
It is well settled that in the inquiry into the nature of a transaction, whatever was said by both parties, as well as what was done, during the continuance of the transaction, is admissible. Roscoe’s Or. Ev. 22. But in this case the objections are directed to the form of the questions, upon the ground of their being leading questions.
It is often extremely difficult to distinguish such questions as should not be allowed because of their leading tendency, from those which, though in form leading, in effect only draw the mind of the witness to the subject of inquiry. But while it is impossible to lay down any fixed rule which will serve in all cases, there are yet certain established rules upon the subject of leading questions, which afford a good test by which to discrim- *112 mate in cases not very doubtful. For instance, that is a leading question which suggests to the witness the answer desired. 1 Stark. Ev. 124; 2 Phill. Ev. 722 ; The People v. Mather, 4 Wend. 249. And that is also a leading question which assumes a fact to be proved which is not proved. A question is also leading, which, embodying a material fact, admits of an answer by a simple negative or affirmative. The latter constitutes an argumentative or pregnant cause of interrogation, which the law holds objectionable. 1 Greenl. Ev. § 484.
On the other hand, however, tháíe are exceptions to the rule which forbids leading questions to be put to a witness in his examination in chief; as, when he is manifestly reluctant and hostile to the interest of the party calling him, or when he has exhausted his memory, without stating the particular required, where it is a proper name, or other fact, which cannot be arrived at by a general inquiry, or when the witness is a child of tender years, whose attention cannot be otherwise called to the subject-matter. Moody v. Rowell, 17 Pick. 498.
It is also to be observed upon this subject, that much discretion is confided to a court in regulating and controlling the examination of witnesses, which is to be governed by the circumstances of each case; and that some courts have gone so far as to hold that the subject, under what circumstances a leading question may be put, is a matter resting in the sound discretion of the court presiding over the examination, and is not a matter upon which to base a motion for a new trial, or which can be assigned for error. Greenl. Ev. $ 435 ; 17 Pick. 498; Stratford v. Sanford, 9 Conn. R. 275.
In order the better to scrutinize the character of the questions propounded in this case to the witness, Mary Folkes, we must bear in mind the state of the evidence at the different periods when they were severally proposed to her. Before the first question now objected to was asked, it had been shown that about seven months had elapsed between the time when the act of violence was alleged by her in her testimony to have been committed, and the finding of the indictment, which, for all that appears, was the first disclosure of the offence charged. *113 It was therefore a material fact for the state to explain satisfactorily the cause of this long concealment by Mary Folkes, of the enormity alleged to have been perpetrated upon her. A sufficient explanation of this long silence might be established by proving that the defendant dissuaded the witness from disclosing the deed by promises or threats, or altogether prevented it by a removal from her friends. It had already appeared in evidence, that from year to year, from a very early period of the orphanage of the witness, he had with constant assiduity insinuated himself into her confidence, and it was fair to presume that, by the accomplished arts of such a delib-liberate scheme of remorseless and calculating villany, he had succeeded in becoming the master and tyrant of her mind, and rendered her the slave either of his promises or threats. Under these circumstances, the witness is asked to reply whether the defendant dissuaded her from disclosing the act, and also whether he informed her what punishment the laws of Mississippi would inflict upon either or both of them in consequence of it. It is clear that both of those questions embody a material fact in the case, and are capable of a conclusive answer affirmatively or negatively. They are likewise interrogatories, pregnant with circumstances indispensable to be proved for the success of the prosecution. Had the witness simply rejoined that the defendant did dissuade her from disclosing the matter, and did inform her that the laws of Mississippi affixed a punishment upon her, for her part in the transaction; such answers, in view of the high degree of abused confidence.already shown to repose in the mind of the witness towards the defendant, must have most satisfactorily accounted for the long delay in bringing the dark atrocity to the exposure of light. But, while the principle of law fortunately is fixed, that, it being often necessary, it is therefore admissible to bring the mind of a witness into contact with the subject of inquiry, especially when a witness is examined as to any conversation or admission, still it is also a principle of law equally fixed, and beyond the control of the indignation of public justice, that, in such questions, the witness should not be prompted to give *114 a particular answer, or be asked any questions to which the answer “ yes ” or “ no ” would be conclusive. 1 Stark. Ev. 124; Nicholls v. Dowding, 1 Starkie’s C. 81; opinion of Lord Ellenborough. It is undoubtedly more convenient to ask a witness whether such a thing was said or done; and questions so framed might in many cases be asked without danger of perjury, even involuntary, and we do not deny that such was the result in the very case under consideration; and there are also instances when such leading questions are proper; as have been before alluded to; but, in ordinary cases, it is certainly most consistent with fairness and justice both to the witness and the defendant, to ask the witness what was done and lohat was said, rather than whether a particular and material thing was done and said. We are compelled therefore to the conclusion that the questions, propounded to Mary Folkes, and which have been examined, conform to the legal definition of leading questions.
It comes next in order, to inquire whether there were any of those peculiarities surrounding this witness, which warranted leading questions to be asked in the direct examination. It does not appear that the witness was hostile to the interests of the state-in the prosecution. On the contrary, every witness, so unfortunately situated as this one was, must be presumed, if supposed to indulge any sentiment upon the subject, other than a desire to simply state the facts of the occurrence, to entertain deep feelings of profound indignation and horror towards her violator. Keeping in mind, that the witness had already deposed as to the perpetration of the actual violence, at the point of time when the questions objected to were propounded, it necessarily became a subject of great moment to her reputation and good fame, to vindicate her purity of mind and chastity of heart. It is -not unreasonable to conceive that any one so unfortunate might be willing to adopt and assent to, whatever might be suggested for her own benefit; and it is wisely provided, that whenever a witness from peculiar situation, has, or upon interrogation, shows a bias in favor of the examining party, a court should prohibit leading questions, *115 even upon cross-examination. Further, the facts sought to be obtained from the witness, were not such as could not significantly be pointed to by general interrogations, or which could not have been extracted from the witness by a skilful and legitimate mode of interrogation. And lastly, upon this branch of the subject, while it may with propriety be inferred, that the witness was very naturally confused, and perhaps confounded by the peculiarity of her position in being required to testify in public, to facts so repugnant to female delicacy, it yet appears that the most dreaded and abhorrent details had been communicated, and it does not appear from the course of examination, that repeated unsuccessful efforts had been first attempted in the proper mode, to call forth what was supposed to exist in point of fact. In conclusion, nothing appears to show that the purposes of justice required the exercise of the discretionary power to vary the general rule controlling direct examinations, but rather the contrary.
It having been determined then, that leading questions were addressed to this witness, and that they were not essential to the ends of justice in this instance, it remains solely to inquire in this connection, whether this court will undertake to interfere with the discretionary power which is admitted to subsist with the courts who preside over the examination of witnesses.
It is true that it has been held in the nisi prius courts of England, that the rules of evidence are exactly the same in civil and in criminal cases, and that in both it is in the discretion of the judge, how far he will allow the examination in chief of a witness to be by leading questions, or, in other words, how far it shall assume the form of a cross-examination. Regina v. Murphy and Douglas, 8 C. & P. 297. But the decisions above quoted from this country, wherein it was held that the matter of judicial discretion respecting the examination of witnesses, was not such as upon which to base an application for a new trial, or which can be assigned for error, were made in civil and not in criminal cases. Yet in the case of Duncan v. McCullough, Admr. 4 Serg. & Rawle, 482, which was a civil action, the supreme court of Pennsylvania, admitting the *116 rule that the manner of examining witnesses is a matter very-much in the direction of the court presiding upon the trial, intimate that they would entertain the question, whether that court would reverse for error on a point in which the law permits the court below to exercise their discretion, provided it appeared that- there had been any abuse of discretion. In the case of The People v. Mather, 4 Wend. 247, which was the case of an indictment for a conspiracy in the abduction of William Morgan, the court, while it also admits the doctrine that considerable discretion is left to a judge who presides at a trial to control and regulate the examination of witnesses, and that appellate courts should cautiously avoid encroaching upon the proper exercise of this discretion; yet held, that if an established rule of law has been violated, the party injured has an undoubted right to relief, and that the court would feel no reluctance to grant it. The rule thus laid down by the supreme court of New York, seems, most consonant to the object of public justice, which is more the protection of the innocent than the punishment of the guilty.
Upon other points relied upon in the case, it now becomes necessary to speak but generally.
In regard to evidence of the actual guardianship of the defendant over the person of Mary Folkes, the chief witness, it was perhaps only necessary to have produced the copy, or a certificate of the grant of letters. This would have been enough to have established the existence of such guardianship during the minority of the ward, unless the contrary was made to appear by proof of a resignation or removal from the trust. Yet I am not prepared to say that the state could not be permitted to anticipate any such presumption, and establish the continuance of the guardianship up to any period necessary to be shown by means of the records of the probate court, granting the letters.
Evidence was introduced as to the good fame of the person violated. This was competent, because she was made a witness in the cause. The party ravished is a competent witness to prove the fact, but the credibility of her testimony must be left to the jury. It is legitimate to support her credibility by evidence of *117 her good fame, or to attack it by evidence of her evil fame. Such evidence tends to show, that the connection with the woman was had against or with her consent. 4 Bl. Com. 213.
In consequence of the inadmissibility of the questions propounded to the chief witness, and the objection to them by the defendant upon the trial below, the judgment must be reversed, and a new trial awarded, by the circuit court of Claiborne county.
Mr. Chief Justice Shaetosy
delivered the following opinion :
I concur in the opinion that there was an error committed in permitting leading questions to be asked and answered, and as the question is one of great importance in the present case, I will briefly state some of the grounds on which my conclusion is based. It is very clearly laid down by elementary writers that leading questions, that is, such as instruct a witness how to answer, are not allowed on the examination in chief, because ‘by directing witnesses in their evidence, the bias which they generally feel towards the interest of the party who calls them, would be strengthened. The strictest observance of this rule is said to be necessary for the discovery of truth and the administration of justice. 1 Phillips Evidence, 268. Starkie says that the principal rule to be observed upon the examination in chief is, that leading questions are not to be asked; that is, questions which suggest to a witness the answer he is to make; he also says, that objections to questions of this nature are of the highest importance. 1 Starkie, 123. But a witness may be examined in an introductory manner so as to lead his mind to the subject; hence it is often difficult to decide whether a question propounded is objectionable. These questions resemble so much the question which was decided to be objectionable as a leading question, in the case of Courteenr. Touse, 1 Camp. 43, as to entitle them to be held liable to the objection. The rule against the admissibility of leading questions is said to be most important, when the question is asked in reference to any conversation, admission or agreement, as there is danger that the witness should by design or mistake be guilty of some variance, and *118 give a false coloring to the transaction. Again, there are cases in which leading questions will be allowed. The instances given are, where the witness appears to be in the interest of the opposite party, or unwilling to give evidence, or when he is so young that it is necessary, to enable him to understand the subject. If the rule is to be relaxed in cases of this kind, it must be enforced with more strictness when a willing witness is to be examined. Whilst it may be relaxed in the case of an unwilling witness for the purpose of extracting truth, it must be rigorously enforced against a willing witness for the purpose of suppressing falsehood. The reason of this rule seems to be, that a bias is supposed to exist in the mind of the witness towards the party who calls him. If such a supposed motive has been deemed a sufficient foundation for the rule, then if there be palpable additional motives, the rule must acquire a corresponding importance, and require to be more rigidly enforced. If the law does not allow a leading question to be asked, merely because of a supposed bias on the mind of the witness, arising from the circumstance that he was called by the party for whom he is about to testify, where there are considerations and motives personal to the witness, the danger of perjury is increased tenfold, and leading questions become too manifestly improper. Was there any such thing as a personal motive to operate on this witness'? The crime had been perpetrated on her seven months before it was disclosed; a circumstance powerfully calculated to induce suspicions that she had been a willing victim to the perfidy of a seducer, rather than a resisting subject of a brutal outrage. Those suspicions were fatal to her character. Her good name was at stake; it was necessary to redeem it from the imputation of unchastity; this could only be done by giving some plausible excuse for the unaccountable delay which had preceded the disclosure; the question suggested the,means of escape; it lead to an answer which might account for that delay, and save the reputation of the witness. When the motive to commit perjury is so powerful, the strictest administration of the law is necessary, and even that may fail to prevent it. This witness must have been fully aware that her long *119 silence would operate against her character, by causing a belief that she had yielded to importunities, and she must have felt a deep interest in removing such belief. Under circumstances like these, it was peculiarly improper that leading questions should be asked. I think it more than likely that the witness told the truth, but that does not alter the case. The law must so operate as to meet all contingencies, and other witnesses under similar circumstances, to whom the rule would equally apply, might be induced to swear falsely. It would be tolerating a temptation to commit perjury. Besides the motives which may have operated on the witness, these questions were put in reference to conversations, admissions and agreements of the accused, in which cases it is said in the books the rule must be strictly enforced.
But it is said to be within the discretion of the court before which the examination is had, to allow leading questions to be propounded or not, and that it cannot be assigned as error. The authorities on this subject are contradictory; by some it is holden to be error; by others it is said to be a matter of discretion. It is of the greatest importance in legal proceedings that truth should be ascertained, and this is one of the rules that the law employs to reach that end; it is said to be a rule of the highest importance, and that the strictest observance of it is essential for the discovery of truth and the due administration of justice. It seems to involve a contradiction to hold that the rule is so important, and at the same time, to hold that it rests solely in the discretion of the court before which the examination takes place. If it be so important for the discovery of truth and the administration of justice, every means should be allowed of enforcing it, The exceptions to the rule show that it is in some instances a rule of discretion, but they by no means prove that it is always to be so regarded. Leading questions may be asked a reluctant witness, or one who seems to be in the interest of the opposite party, or one who is so young as to make it necessary. In such cases the court has a discretion. If, in the opinion of the court, the witness testifies reluctantly, or seems to favor the interest of the opposite party, leading ques *120 tions may be allowed. The court in its discretion is to judge of the necessity for such questions. In this we perceive the reason for classing it as a rule of discretion. But is it still a rule of discretion, when it is manifest that the witness favors the party by whom he is called ? It would seem not. The discretion is to be exercised in deciding when the questions of a leading character are to be permitted, but when it is perfectly manifest that they are not necessary, then the court has no discretion ; it must prohibit them. This is a matter which cannot, in many cases, be made to appear in an appellate court; and hence it is often said to be matter of discretion to allow such questions or not. But there are cases in which the record will enable the appellate court to judge of the necessity or impropriety of such questions. When it is perfectly manifest from the language of the witness, and from the relation which he bears towards the person against whom he is testifying, that he is and must be hostile to the interest of that party, and must, in the nature of things, desire that the verdict should be against him, then leading questions are certainly improper, and if such a state of things is exhibited by the record, it must be competent for an appellate court to correct an error which has occurred by permitting leading questions to be asked. Under such circumstances, the court has no power to allow a leading question to be asked ; the law forbids it; and if it should be allowed it is an abuse of discretion, and if the facts can be made to appear in the appellate court, the error may be corrected. It is because the appellate court cannot, as a general rule, be advised of the temper of the witness— of his bearing and manner, that it will not undertake to control the court below in the matter of leading questions. But where it can be fully informed — where the record furnishes the means of judging of the propriety, of such questions, I see no reason whatever why the appellate court should not exercise its judgment. It would seem to be peculiarly proper that it should do so, when a rule confessedly important for the discovery of truth and the due administration of justice, has been violated. Now what is the state of facts exhibited by this record. They need not be repeated. It is perfectly apparent that the *121 witness was not favorably disposed towards the prisoner. In the nature of things she must have desired his conviction ; she was not reluctant to testify against him. Of these facts we are fully informed by the record, and therefore capable of judging of the propriety or impropriety of leading questions. As a general rule, I would admit that leading questions are to be regulated by the discretion of the circuit court; but when it is apparent that there was a powerful motive personal to the witness beyond the mere bias supposed to arise in favor of the party who calls the witness, and where it is also apparent from the record, that there was no necessity for allowing leading questions to be put, but on the contrary powerful reasons why they should not have been allowed,'then I shall be willing to hold that it is a matter which may he assigned as error; then the error can be shown, and ought to be corrected. I would also advert to the fact, that the legislature has gone very far to limit the discretion of the circuit courts over the evidence given at the trial, by allowing parties to reduce the evidence to writing, and take appeals from motions for new trials.
But to my mind this record exhibits other errors on which a judgment of reversal may rest with even less doubt than that above referred to. After the witness Mary Folkes was examined, the state introduced a transcript from the records of the probate court of Warren county, containing the appointment of the accused as guardian of Mary Folkes and her two sisters, and exhibiting every step taken in the progress of guardianship, and every order of court made in relation thereto, beginning in-November, 1886, and ending with his removal in May, 1845. It contains his annual accounts, which specify every item charged to each of his wards, and every order of the court made in relation thereto. It contains the petition of the accused, that he might be permitted to sell all the slaves of his wards, on pre-tence that it would be for their benefit, and the order of court granting the petition, and also the return of sales. It is but too manifest that the sale was to their prejudice. The slaves were but few in number, and mostly young and valuable. No good reason was shown for the sale, but still the court allowed it, *122 under a promise tendered in the petition that the accused would support his wards at his own expense. But when the sum of $4000 came to his hands, we find him violating this pledge, by asking to be permitted to hold it without interest, on the ground that he was sending the girls to school. This record then exhibits his solemn pledge, and his violation of that pledge. It also shows that his surety became alarmed, and he was cited and required to give other sureties. He was formally removed, but the money of his wards was not accounted for; that was doubtless squandered; at least it was not surrendered. The witness was not only despoiled of her virginity, but of her fortune also. What but prejudice could be excited by an examination of this record, in connection with the facts before the jury; and what had these proceedings to do with the issue before the jury ? Was it necessary that the jury should know how he had managed the estate of his ward, in order to enable them to determine whether he had committed a rape on her 1 Even if this record did not excite a prejudice, still it was so much irrelevant matter. The prisoner had a right to have the whole mind of the jury directed and confined to the single inquiry of guilty or not guilty. But instead of that their attention was divided, and directed to an examination of his management as guardian. They could but see that he had contrived to cheat his wards out of their property. It will not do to urge the necessity of this whole record as proof; it was not necessary. If it was necessary to prove the fact that he was guardian, which I admit it was competent for the prosecution to do, a mere extract from the order of appointment, or a certificate from the proper officer that he had been appointed, was all that was necessary. This is the way that the appointment of an administrator is proved, and it is all that is necessary. 1 Phillips Ev. 398. A party cannot introduce the various settlements with the probate court in reference to a particular estate, and the orders made by the court during a period of nine years, merely because a single entry happens to be an important item of proof. It was not necessary to introduce this record to prove that he continued guardian. It followed as a necessary presumption from his *123 appointment that he continued guardian, as a guardian is appointed to continue in office during the minority of his ward. In any point of view then this record seems to me to have been inadmissible. If it contained matter that was calculated to excite a prejudice, without having any bearing on the issue, it was of course inadmissible; and if it contained matter apparently innocent, if it was irrelevant, it was inadmissible.
I also think that the examination of Samuel Luckett was foreign to the issue. This question was propounded to him: “Please tell whether or not you last fall, or at any other time, offered Mary Folkes a home at your house, or authorized your wife to do so; if so, state in what manner, and when.” We are informed by the bill of exceptions, that the witness answered in the affirmative, and proceeded to state the reasons which induced him to do so, and which he stated to his wife; but the language of the witness is not given; it is therefore difficult to show its objectionable character; but this much I am free to say ; I cannot imagine any possible motive which dictated the conversation between the witness and his wife, that would have been proper as evidence, or that could justify the admission of the conversation which passed between them, as evidence. Such conversation was not part of the res gestee, but it seems to have been a disclosure of reasons which prompted the witness to offer Mary Folkes a home at his house. If a conversation, held between the witness and his wife, the prisoner not being present, was admissible as evidence in this trial, it would seem to be difficult to say what would not be admissible. There is other testimony of the same character. M. C. Folkes was called as a witness, and proceeded to state a conversation which passed between him and his brother, in reference to Mary Folkes. This conversation is set out in the bill of exceptions, and speaks its own condemnation. If it was admissible, there seems to be no limit to the admissibility of conversations between third persons. On the whole I am of opinion that the judgment should be reversed, and a new trial awarded.
*124 Mr. Justice Clayton
delivered the following opinion.
I cannot concur in the reversal of this cause. I am not satisfied that the questions considered objectionable, fall within the class of questions denominated leading. I fully concur with the court in Mather’s case, 4 Wend. 247, “ that it is píten a matter of extreme difficulty to distinguish such questions as ought not to be tolerated because they are leading, from those which, though in their form leading, are in effect only calculated to draw the mind of the witness, to the subject of inquiry.”
This difficulty is very apparent, from the various definitions or descriptions which have been attempted of leading questions. The most usual definition is, that they are those which may be answered by a mere affirmative or negative, and in which consequently the answer is fully suggested by the question. Another is, that they embody a material fact, and admit of an answer by a simple negative or affirmative. Another, that the question propounded involves an answer bearing immediately upon the merits of the cause, and indicating to the witness a representation which will best accord with the interests of the party. Two other objections to questions are likewise stated in the books, though they do not partake of the character of leading questions. One is, that an argumentative or pregnant course of examination, is as faulty as the like course in pleading; — the other, that the interrogatory must not assume facts to have been proved, which have not been proved. 1 Greenleaf, § 434; 2 Pothier on Ob. by Evans, 203, 205.
Tried by any or all of these tests, and the questions in this case are not dearly and certainly objectionable. The first of them was this: “ If Mr. Turney, then or at any subsequent time said anything to you in relation to this matter to dissuade you from disclosing it, state when, where and what he said.” This could not be answered by a simple negative or affirmative, nor does it suggest to the witness the answer which is desired. The objection presupposes, or it is of no force, that the witness is ignorant, and would not, without prompting in some shape or other, know how to tell a story or frame an answer, that would be favorable to the party for whom he is called. It *125 would require no little sagacity to discover from this question, any representation which will best accord with the interests of the party. Unless the mind of the witness had been previously directed to this point, and unless she had learned the necessity of explaining away her silence, this question could not have instructed her what answer to give. If she had been previously crammed for the occasion, the question was harmless, and the utmost latitude of cross-examination was allowable to detect and expose the fact that it was a fabricated tale. The witness no doubt stood in a suspicious attitude; she must have felt a deep interest in the result, and the jury had a right to take into view all these considerations, and to receive her testimony with allowance. But, when all this is conceded, I cannot see, that this question suggested what answer she was to give, or put words into her mouth, which she was to echo back, again.
The next question was this : “ If in any of his antecedent conversations he offered property or any other advancement to you, in order to attach you to him, say so.” It is not easy to see how this question could have assumed a less exceptionable shape. All the av'horities say, you may bring the mind of the witness to the precise . point, about which you wish to inquire. Could this have been done in a less objectionable mode 7 The last question was this: “If at any time subsequent to this transaction he said anything about what punishment the laws of Mississippi would inflict on him, or you, or both, state it all.” This question is perhaps more free from objection than either of the others. In one sense all questions are leading, they point the attention of the witness to the subject about which he is requested to testify. Judge Cowen, in his notes to Phillips on Ev. after a careful review of the subject, thus states the general rule: — In cases of conversations, admissions and agreements, you may draw the witness’ attention to the subject, occasion, time, place, person, and ask directly whether such a person said anything on the subject thus brought under attention : and if yea, what did he say.” Yol. 2, p. 724. These questions in my view, do not fall under condemnation by this rule.
*126 In Watson’s case, 3 O. L. R. 280, it was held, that the prosecutor might point to the prisoner, and ask the witness, if he were the person meant. In the case of the People v. Mather, 4 Wend. 247, the question objected to was, “ how did you address the defendant in respect to his being one of the persons concerned,” in the abduction of Morgan 1 The court said, “ this question assumes the fact as true, which it was the object of the question to prove. It assumed that the witness did address the defendant, as one of the persons concerned in carrying off Morgan, and only asked him to tell the manner of the address.” Now the questions in the case before us, assume the existence of no fact, but ask the witness if the fact do exist, to say so. It therefore, as I conceive, is no authority in this case, although urged as such.
But, if these questions were to be regarded as leading, their admission rests in the sound discretion of the court, and is not error for which a reversal can be had. There is not in the English books, so far as I have seen, and none certainly was produced upon the argument, a case in which such objection has been taken in the appellate court. Every one that I have been able to find,’ occurred in the progress of the trial at nisi prius, and was put finally to rest by the judge who presided. Greenleaf and the American editors of Phillips on Evidence, lay down the rule, that it is a matter resting in the sound discretion of the court, and which cannot be assigned for error. 1 Green. § 435 ; 2 Phill. 725. This rule is distinctly recognized in Stratford v. Sanford, 9 Conn. 275, and in Moody v. Rowell, 17 Pick. 498. It is true, that in the case of The People v. Mather, 4 Wend. 247, a different rule is propounded. Indeed, there are but few points in the whole circle of the law, on which conflicting opinions of American courts may not be found. In all such instances of conflicting opinions as to the common law, the only true source to which we can resort for a resolution of doubts is the English authorities, and in them, this point seems never to have been urged as a ground of error.
All the writers admit that the asking of a leading question, rests in the sound discretion of the court, in which the trial is *127 had. It is a settled principle of common law, that the exercise of discretionary power, is not in general; if indeed under any circumstances, a matter examinable upon a writ of error. Comyn Dig. Error A.; Barr v. Gratz, 4 Wheat. 213. There may be exceptions, to which reference will hereafter be had; but this court has repeatedly recognized this as the general rule. Because this was the law, the legislature of this state enacted that a writ of error, should lie, for the granting or refusing a new trial. Before this statute, that was a matter resting in the sound discretion of the court, which tried the case, and was not ground of error. The legislature has passed other acts trenching upon the discretionary powers of the courts. These acts must be obeyed ; but it does not thence follow, that the restriction is to be carried beyond the limit indicated by the legislature. I have just stated that there might be exceptions to this rule; though many courts have refused to allow of any. I think it safer to admit that the wrong exercise of legal discretion may be matter of error; “but the error must be gross and palpable, and not subject to hesitation or doubt; and must have produced flagrant and oppressive injustice.” This is the language of the cases. Smith v. Britton, 4 Hump. 202 ; People v. Mather, 4 Wend. 247 ; 5 Hump. 568; 2. Rob. Va. Rep. 849; 10 Leigh, 692.
This case does not fall within such rule. It is matter of much doubt, whether the questions are liable to the objection at all. The books lay down various cases, which constitute exceptions to the general rule as to leading questions, and in which they are admissible. One of these is, when the witness is a reluctant one as to the party calling him, or manifests a bias against such party. All the evidence in this case is not set out; it is impossible then for this court to know whether the witness was willing or reluctant, or whether the state of the case did not exist which authorized such mode of interrogation. The manner and bearing of the witness cannot be transferred into the bill of exceptions. The presumption is in favor of the acts of the court below. If in one state of circumstances the question was proper, and in a different state im *128 proper, and if this court has not the means to determine which was the true state of the case in this instance, this presumption sustains the decision of the court below. We cannot reverse unless we see there is error.
In most cases of exceptions, the objection is to the answer, not to the interrogatory. The court excludes or admits the answer as may be right. But here the objection is to the question, because it may teach the witness what answer to give. It subjects him to suspicion. The objection goes not to the competency, but to the credibility of the witness. For if he means to tell the truth, the mode of examination will not induce him to tell a falsehood. Starkie says, “ that answers extracted by such improper means, are of little advantage in general to the party in whose favor they are given, since evidence obtained from a partial witness, by unfair means, must necessarily be viewed with the utmost jealousy.” “Such evidence is very unsatisfactory, and open to much remark.” 1 Starkie, 150, 162. It is the province of the jury to decide upon the credibility of the witness, and no court can invade that province. Yet I cannot see how a judgment is to be reversed because a leading question is asked, without infringing the right of the jury to determine upon the credibility of all testimony. If the question be not answered, all will agree that it will do no harm; if it be answered, it is only objectionable because it may lead the witness to tell an untruth. Whether he does so or not is matter for the jury, and it seems to me that by reversing a judgment for this reason, we place ourselves in the proper position of the jury.
It has been shown that the erroneous exercise of a discretionary power by a court, will not be ground of reversal, unless it be productive of flagrant and oppressive injustice. Is the asking of a leading question likely to work such a result? Starkie says they are of little advantage to the party. Mr. Evans, in his edition of Pothier on Contracts, lays even less stress on them. Yol. 2, p. 203. Lord Ellenborough said, “ If questions are asked, to which the answer yes or no would be conclusive, they would certainly be objectionable, but in general *129 no objections are of less moment, than those which are made to questions as leading ones.” Nicholls v. Dowding, 1 Starkie, N. P. C. 81; 2 Com. Law Rep. 305. It is not probable, therefore, that injury or injustice was done to the prisoner, by these interrogatories ; and it would extend the rule beyond the limit indicated in any case that I have seen, so to hold.
This point was the one mainly discussed in the argument, and after having bestowed so much time upon it, I shall dwell but briefly upon the others.
The record of the probate court perhaps contained some matters, which were irrelevant. Parts of it, however, were clearly legal and proper testimony; indeed the only legitimate testimony of facts, which it was important to establish. The counsel for the prisoner did not move for the exclusion of those parts of the record which they deemed objectionable, but of the whole. This motion could not have been sustained, because a part was clearly legal and necessary proof. As to the presumption, that, when the guardianship was once established, it continued until its determination was shown, the reply is, that a party cannot be required to rest his case upon presumptions, when he has positive proof in his power. On this point I concur with judge Thacher.
In regard to the other exceptions, a few words will form my answer to them all. They all rest upon the ground, that the testimony offered was irrelevant, and ought not to have been admitted.
This court has decided, on more than one occasion, that although testimony ought in strict practice to appear to be relevant, at the time it is offered, yet if it appear to be so at any time during the trial, it is sufficient. If it do not, then it should be excluded, when the testimony is closed. Lake v. Munford, 4 S. & M. 312.
The bill of exceptions in this case does not purport to set out all the testimony; there was at the close of the testimony no motion to exclude that in question, nor any motion for a new trial. It was an important point, upon the part of the prosecution, to account for the long silence of this ruined *130 girl. To do so, it might have been important to unravel the web of cunning and falsehood, by which the prisoner, after having spoiled her of all that gives pride and purity to womanhood, had made her the slave of his will, and, to conceal his guilt, had removed her to a distance from her friends and counsellors. The testimony excepted to, might have been relevant and pertinent for that object. It was manifestly introduced for that purpose. ■ If it were not pertinent, the bill of exceptions should have disclosed the whole evidence, and furnished the means of determining its propriety, in connection with all the proof, not on partial and garbled extracts. An exception for the exclusion of testimony, rests upon a different footing. ' Worten v. Howard, 2 S. & M. 530.
It is my conclusion, that if there be error, the judgment is irreversible, because the record does not furnish the necessary mea.ns of enabling us to decide, whether the evidence was irrelevant.